## HOWELL v. KINCANNON.

Opinion delivered February 17, 1930.

*Harney M. McGehee,* for appellant.

*Dave Partain* and *R. S. Wilson,* for appellee.

BUTLER, J. W. H. Howell was convicted in the Crawford Circuit Court at its March term, 1929, of murder in the first degree, sentenced to be executed, and confined at the penitentiary walls awaiting the date of his execution which has been set for the 28th day of February, 1930. On February 4, 1930, the Honorable J. O. Kincannon, judge of the 15th Judicial Circuit, in which Crawford County is situated, issued a writ directed to S. L. Todhunter, warden of the State penitentiary, commanding him to produce Howell in the Crawford Cir-

cuit Court on the 14th day of February, 1930, to the end
that his present sanity or insanity be inquired into and
determined. The said Howell, by his attorney, Harney
M. McGehee, filed in this court his petition, alleging that
the said J. O. Kincannon, as judge, and the Crawford
Circuit Court were without authority to issue the afore-
said writ and without jurisdiction to hear and determine
the same, and prayed that the said judge be prohibited
from proceeding further in this regard.

The question presented to this court for determin-
ation is whether or not, after sentence has been pro-
nounced, court adjourned, and the condemned indivi-
dual transported to and confined in the penitentiary
awaiting execution, has the court at which the trial was
held, and which rendered judgment, authority to inquire
into the question of the sanity or insanity of the con-
demned arising after judgment, or to make any orders
in regard thereto? The authority sought to be pro-
hibited is one which the courts have attempted to exer-
cise but rarely, and this is the first time the question has
come directly before this court. Our investigation of
the textwriters and adjudicated cases discloses a sing-
ular paucity of authority on this question.

In Smoot on the Law of Insanity, § 455, it is said:
"Where the defendant in a criminal trial is found to
be insane subsequent to trial, verdict and sentence, the
insanity has the effect of suspending further procedure.
If it occurs subsequent to the trial and verdict, and be-
fore sentence, no sentence can be pronounced against
the defendant while he is in such condition, not only
because it cannot be carried out, but because he would
not be able to understand the nature and import of the
proceedings, and would not be able to intelligently
answer whether there was any reason, as there might
be, why judgment should not be pronounced."

Mr. Bishop, in the second edition of his work on
Criminal Procedure, § 1369, in discussing the writ of

error *coram nobis*, says: "With us, the cases to the question are few, yet sufficient; as, if unknown the defendant was insane at the trial, or if being in danger and trepidation from a mob he pleaded guilty, and was sentenced to prison to save his life, or if being under eighteen he was sentenced to a punishment permissible only against an older person, this writ of error *coram nobis* is maintainable."

Mr. Blackstone says: "If a man in his sound memory commits a capital offence, and before his arraignment he became mad, he ought not to be arraigned for it; because he cannot advisedly plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced, and if, after judgment, he becomes of nonsane memory, his execution shall be stayed; for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." 4 Blackstone, Commentaries. Cooley's Ed., page 24.

From the above authorities, it will be seen that the law for the sake of humanity early recognized the propriety of staying the execution of one condemned to death where it might be shown, after trial and judgment, that the defendant was either insane at the time of the trial or had become insane thereafter; and as no method was pointed out to make this beneficial rule effective, the courts, because of the duty arising in such instances making it incumbent on rational beings out of the dictates of humanity to find a remedy, of necessity assumed the power to inquire into the sanity of a condemned person, and, where it appeared upon investigation that the condemned was insane, revoked the judgment or stayed the execution. The power thus assumed was recognized to inhere in the courts to be exercised so long as the law-making power should fail to point

out a method by which these questions might be heard and determined; but, whenever that voice should speak and declare a mode and method different or place the authority to determine these questions elsewhere, the power of the courts would necessarily cease.

In the case of *Adler* v. *State,* 35 Ark. 517, 37 Am. Rep. 48, this court has held that a circuit judge has power, after the expiration of a term, to issue the writ of error *coram nobis* to reverse a judgment of conviction in a criminal case where it is shown that the defendant was insane at the time of the trial, and that fact was not made known. This rule has been subsequently upheld by this court in a number of decisions, but we have failed to find any case where the writ was issued or its issuance approved by the court in a case where the defendant became insane after the trial, judgment, and lapse of the term, except where the language was obiter. We may assume, however, that such right inhered in the court unless the Legislature had pointed out another and different remedy. It is insisted by the respondent that such power is now inherent in the circuit court, and he cites as authority to that position the cases of *Johnson* v. *State,* 97 Ark. 131, 133 S. W. 596, and *Ferguson* v. *Martineau,* 115 Ark. 317, 171 S. W. 472, Ann. Cas. 1916E, 421. Upon a cursory examination, those cases appear to support that view. In *Johnson* v. *State, supra,* the court, quoting from the statute providing that, when a defendant appears for judgment, he may, for cause against the judgment, show that he is insane, and that the court, on reasonable grounds for believing that such is the case, may impanel a jury to determine the question, uses the following language: "If the insanity of the defendant be not brought to the attention of the court, and inquired into before the judgment is pronounced, the circuit judge may, after the expiration of the term, issue the writ of error *coram nobis* to set aside the judgment of conviction and suspend sentence in accordance with the statute above quoted."

And in the case of *Ferguson* v. *Martineau, supra,* at page 326, the court said: "It cannot be doubted, therefore, that, even in the absence of any statute upon the subject, the circuit court or judge thereof, in vacation, would have the inherent power to say that the execution of the judgment of that court was not in force upon a person who was insane at the time set for his execution. A writ upon proper application could be issued by the court or the judge thereof, returnable to the court to inquire into the alleged insanity of the prisoner at the time set for the execution to the end that the sentence of the law might not be carried out if it were determined by a jury empaneled for the purpose that the defendant were insane." Upon further investigation of these cases, however, it will be seen that this question was not before the court. In *Johnson* v. *State,* the only question before the court was an alleged error in the selection of the jury, and the only defense made at the trial was that of insanity. The court there said: "After a careful examination of the record, we are of the opinion that there is no error and the judgment should be affirmed," but, on the suggestion that since the judgment and verdict was rendered the defendant had been pronounced insane, and removed from the jail to the county hospital, the court further said: "That, however, does not affect the adjudication of this court affirming the judgment of the trial court where no error is found in the record of the trial. Appellant pleaded insanity as a defense to the crime, but no plea of present insanity was interposed at the trial, nor was there any suggestion of present insanity as a reason why judgment should not be pronounced on the verdict of the jury. There is no provision in the statute for suspending proceedings in this court on account of appellant's insanity, though ample protection is provided in that respect in the lower court. The circuit judge has the power to issue the writ of error *coram nobis* to set aside a judgment of conviction

when it appears that the defendant was insane at the time of the trial, and the fact was not made known at the trial."

The question before the court in the instant case was not remotely connected or involved in the case of *Johnson* v. *State, supra,* so that the language there used by the learned chief justice as above quoted is clearly referable to the question of procedure where insanity exists before the judgment is pronounced. In the case of *Ferguson* v. *Martineau, supra,* the only question before the court was the jurisdiction of a court of equity to restrain by injunction the execution of a criminal under judgment to enable the probate court to inquire into the sanity of the condemned, and it was held that such court was without jurisdiction, and that a writ of prohibition was the proper remedy to prevent the usurpation of jurisdiction. Therefore, the language above quoted was *obiter dictum,* and, while not carefully chosen, it is fairly inferable from the cases cited (*Adler* v. *State, supra,* and *State* v. *Helm,* 69 Ark. 167-71, 61 S. W. 915) as authority for the language used, that the power of the circuit court referred to was the power to suspend sentence before judgment was rendered. All the decisions of this court called to our attention, to-wit, *Adler* v. *State, supra, Linton* v. *State,* 72 Ark. 532, 84 S. W. 608, and *State* v. *Helm, supra,* are cases where the question of insanity was raised or referred to before judgment was rendered.

The Legislature of this State, at an early date, provided, (chapter 44, § 14, of the Revised Statutes of 1838) that "if, after judgment and before execution of the sentence, such convict becomes insane or lunatic, if the punishment be capital or corporal, the execution thereof shall be stayed until the recovery of such convict from such insanity or lunacy"; and, by chapter 45, §§ 187, 188 and 189 provided the method by which

insanity might be determined and the procedure for such determination as follows:

"Section 187. If, after any convict be sentenced to be punished by death, the sheriff shall have cause to believe that such convict has become insane, he may summon a jury of twelve competent jurors to inquire into such insanity, giving reasonable notice thereof to the attorney for the State."

"Section 188. The attorney for the State shall attend such inquiry, and may produce witnesses before the jury, and may cause subpoenas to be issued by a justice of the peace for that purpose; and disobedience thereto may be punished by the circuit court, as in other like cases."

"Section 189. The inquisition of the jury shall be signed by them and by the sheriff; and if it be found that such convict is insane, the sheriff shall suspend the execution of the sentence until he receive a warrant from the Governor or the circuit court, as hereinafter authorized, directing the execution of such convict."

"Section 190. The sheriff shall immediately transmit such inquisition to the Governor, who may, as soon as he shall be convinced of the sanity of such convict, issue a warrant appointing a time for the execution of such convict, pursuant to sentence."

By § 290 of chapter 10 of the Criminal Code, approved July 22, 1868, it was provided that, "the only officers who shall have the power of suspending the execution of a judgment of death are the Governor, and, in cases of insanity or pregnancy of the defendant, the sheriff, as provided in the next section; and, in cases of appeals, the clerk of the Supreme Court, as prescribed in title 9, chapter 1, article 1."

Section 291 of the Code is as follows: "When the sheriff is satisfied that there are reasonable grounds for believing that the defendant is insane or pregnant, he may summon a jury of twelve persons on the jury list,

drawn by the clerk, who shall be sworn by the sheriff, well and truly to inquire into the insanity or pregnancy of the defendant, and a true inquisition return; and they shall examine the defendant, and hear any evidence that may be presented, and by a written inquisition, signed by each of them, find as to insanity or pregnancy. And, unless the inquisition find the defendant insane or pregnant, the sheriff shall not suspend the execution; but if the inquisition find the defendant insane or pregnant, he shall suspend the execution, and immediately transmit the inquisition to the Governor.''

Section 292 of the Code is as follows: ''Whenever a judgment of death has not been executed on the day appointed therefor by the court, from any cause whatever, the Governor, by a warrant, under his hand and the seal of the State, shall fix the day of execution, which warrant shall be obeyed by the sheriff, and no one but the governor can then suspend its execution.''

It will be seen that as early as 1838 the Legislature, by specific enactment, placed with the sheriff, who had custody of the condemned, the duty, when occasion arose, to have inquiry made as to his sanity, and to report the finding, if found to be insane, to the Governor, and by the express language of § 290, Criminal Code, *supra*, no one but the Governor, the sheriff, and the clerk of the Supreme Court could in any manner, or for any cause, suspend the execution of a judgment of death. As a result, whatever inherent power existed in the circuit court until that time was divested, and the duty to determine the question of insanity of the defendant devolved upon the sheriff. The provisions of our Criminal Code are almost identical with those of the Criminal Code of the State of Kentucky in force at the time of the adoption of our Code, which was followed by the commissioners in drafting the Code approved and adopted by our Legislature. By the Kentucky Code, as by our own, the sheriff was clothed with authority to

make inquiry into the insanity of a defendant in his custody under sentence of death, and in Kentucky it has been held, since the enactment of its Criminal Code, that "up to the time of final sentence that discretion (to suspend sentence in case of insanity) is vested in the trial judge; after sentence, the policy of our law seems to be to vest it in the executioner." In view of the sections of our Criminal Code above quoted, and especially of § 290 *supra,* we can come to no other conclusion than that in cases of insanity after sentence, circuit courts have no longer authority to deal with that question.

Act No. 55 of the Acts of the General Assembly of 1913 changes the mode of execution of the death penalty from hanging to electrocution, the custody of the prisoner after judgment and before execution from the sheriff of the county to the superintendent of the State penitentiary, and the place of execution from the county where the crime was committed to the death chamber within the confines of the State penitentiary. As we have seen, from an examination of the Acts of the General Assembly from 1838 it has been the policy of the law for the person charged with its administration to exercise discretion as to holding insanity inquisitions in capital cases. The sections of our Code above quoted are now §§ 3250 and 3251 of Crawford & Moses' Digest, and, as it "gives an insane condemned person who has no further recourse in law a remedy where none other existed by statute before," it is remedial in its nature, and should therefore be liberally construed so that the remedy be made effective if it can be done. At the time this statute was passed the sheriff was the executioner, and had the custody of the person of the defendant from the date of judgment to that of execution, and he was therefore the only one who could have full and free access to the presence of the defendant, and observe him during the time of his confinement before execution; and, since by the enactment of act No. 55, *supra,* all

these duties and opportunities for observation have passed from the sheriff to the keeper of the penitentiary, the only way by which those sections of our Code, *supra,* can be given any practical effect is by substituting the keeper of the penitentiary for the sheriff.

A number of authorities have been called to our attention on this point in the able brief of the Attorney General which we deem it unnecessary to review herein since our court has always recognized that statutes remedial in their nature should be liberally construed so as to afford all the relief within the power of the court which the language of the statute indicates the Legislature intended to grant. By the terms of the statute, the Governor, and, in cases of insanity, the sheriff, and on appeals to this court, the clerk of this court, were the only authority by which sentence of one condemned might be stayed after judgment; and, as the purpose of the section following was to clothe the officer charged with the execution of the death sentence, having in his custody the person of the condemned, with the duty of causing inquiry to be made as to the sanity of the defendant, when he had reasonable grounds to believe the defendant insane, then to give any other effect to the statute, since the enactment of act No. 55, *supra,* would render the remedy abortive, and in effect destroy the law.

In the case of *Barrett* v. *Commonwealth,* Court of Appeals of Kentucky, December 21, 1923, reported in 202 Ky. 153, 259 S. W. 25, in dealing with an identical situation to that in the instant case, where the law at first clothed the sheriff with authority to institute and conduct insanity inquisitions when he was executioner, and where the mode of execution was afterwards changed from hanging to electrocution, and the executioner from the sheriff to the keeper of the penitentiary, as in this State, the court said: ''We can see no reason why, after the removal of the convict to the penitentiary, such an in-

quest may not be held by the warden of the penitentiary, if he is satisfied there are reasonable grounds to believe the condemned insane or pregnant. In this respect he simply takes the place of the sheriff, and performs the same duties except as to the place and manner of execution. He has custody of the condemned, and is informed as to his mental condition. Being charged with the solemn execution of the death penalty, such an affliction upon the part of the condemned person appeals to his mind and conscience, as he is the natural one to intrust with the responsibility of determining whether or not there are sufficient grounds for holding an inquest.''

We therefore think that, in order to give effect to the statute providing for the stay of the execution of a condemned insane person, it is necessary that the warden be clothed with all the powers which were entrusted to the sheriff before the passage of act No. 55, *supra.* and that it is now the duty of the superintendent of the penitentiary to conduct the insanity inquisition.

We have not overlooked the cases cited by respondent in support of his construction of the holding of the court in the cases of *Johnson* v. *State,* and *Ferguson* v. *Martineau, supra,* but we have examined these cases and do not find them in conflict with the views herein expressed. The case of *In re Smith,* 25 N. M. 48, 176 Pac. 819, 3 A. L. R. 83, cited by respondent. we find, turns on the construction of the statute under which the proceedings in a criminal case in which an insanity inquest was held, and such statute was held by the court to be not applicable to criminal proceedings, but was a statute for the protection of civil and property rights. In the case of *State* v. *Superior Court,* 139 Wash. 125, 245 Pac. 929, 49 A. L. R. 801, cited by respondent, the question before us in the case at bar was not there before the court. The question was whether in insanity inquests the change of venue statute of that State applied. The other cases cited by respondent merely recognized and approved the

inherent power of courts at common law in proper cases to have control of their judgments, and, of necessity, the protection of insane persons where the law is silent, and did not consider statutes such as ours, which has taken from the courts such inherent power.

The prayer of the writ of prohibition must be granted, and it is so ordered.

Mr. Chief Justice HART agrees with this opinion except as to that part of the opinion which holds that the effect of our statutes is to abolish the power of the court, and he is of the opinion that the circuit court still has power in cases of present insanity after judgment to determine that question by proper proceeding.

HART, C. J. I agree that the question under consideration is a matter subject to legislative regulation, but I do not agree that the connection of courts with proceedings of this sort has been taken away by the statutes construed in the majority opinion. To so hold, according to my notion, is impliedly at least to overrule the holding in *Sease* v. *State* 157 Ark. 217, 247 S. W. 1036, to the effect that after verdict and sentence, the court may inquire by inspection and by witnesses whether the prisoner has become insane since his sentence. I quote from that opinion the following:

"The petition now before us is sufficiently broad, however, to constitute an allegation of insanity at the present time and to invoke relief by suspension of the sentence as long as the condition of insanity of the accused exists."

"In our former decisions we have recognized the power of the court to grant relief in capital cases, where the convict is insane when the time comes for executing the judgment. This remedy however, as shown in the Kelley case *supra* (156 Ark. 188, 246 S. W. 4) must be exercised with caution, and the court determines as a preliminary question, whether there is sufficient ground for entering upon an investigation of the question of the insanity of the convict. As we have already said,

the testimony now adduced is merely cumulative of that which was adduced at the trial and tends only to show general insanity, which began long before the commission of the homicide. It is true there were introduced the affidavits of physicians, who testified as experts, but that testimony is merely cumulative. There was no showing of a substantial change in the prisoner's condition since the original trial.''

It has been suggested that the court decided that case without having its attention called to the statute now under consideration. Reference to the briefs filed for Sease show that the case first cited is 115 Ark. 317, 171 S. W. 472, which is *Ferguson* v. *Martineau,* where the court discussed the effect of the statutes upon each other, and concluded by saying: ''It cannot be doubted, therefore, that, even in the absence of any statute on the subject, the circuit court, or judge thereof, in vacation would have the inherent power to say that the execution of the judgment of that court was not in force upon a person who was insane at the time set for his execution. A writ upon proper application could be issued by the court or the judge thereof returnable to the court to inquire into the alleged insanity of the prisoner at the time set for the execution to the end that the sentence of the law might not be carried out if it were determined that the defendant was insane.''

In both cases, the court doubtless considered that the Legislature intended that the officer named in § 3251 of C. & M. Digest might suspend the execution of the death sentence until he could transmit the inquisition to the Governor for his information in the exercise of the power to grant reprieves, commutations of sentence and pardons after conviction conferred upon him by article 6, § 18, of the Constitution; and that it was not intended by the Legislature to take away the jurisdiction of the courts in the matter in the manner outlined above. Neither was it intended that § 3250 of the Digest conferring upon certain officers under certain circum-

stances the power of suspending the execution of a judgment of death should take away the jurisdiction already possessed by the courts.

If, as now declared, the sections of the statutes are controlling, and the jurisdiction of the trial court in a proceeding like this is at an end, the court should have so held in the Sease case to the end that his attorneys might have availed themselves of the only legal remedy in his behalf after sentence of death, and thus have pointed out and secured to him the constitutional guaranty of our bill of rights and the 14th Amendment of the Constitution of the United States that no person shall be deprived of his life without due process of law.